UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.   18-21755-CV-WILLIAMS
MAGISTRATE JUDGE REID

JOHN LOUIS RAMOS,

     Petitioner,

v.

MARK INCH,

     Respondent.

_____/

## **REPORT OF MAGISTRATE JUDGE**

### **I. Introduction**

This Cause is before the Court upon Petitioner's Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, challenging the constitutionality of his convictions and sentences for having a vehicle with prohibited lights and for falsely personating a police officer, following a jury trial, in Case No. 2012-CF-002468 entered in the state circuit court in and for Miami-Dade County, Florida. [ECF No. 1].

This Cause has been referred to the Undersigned for consideration and report, pursuant to S.D. Fla. Admin. Order 2019-02. [ECF No. 2]. For the reasons detailed below, the Petition should be denied.

## II. Claims

Construing the arguments liberally, as afforded to *pro se* litigants pursuant to *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972), Petitioner raised the following claims:

> 1A. The trial court violated due process by entering a conviction and sentence for a lesser included offense of which the jury was not instructed and of which the prosecution and defense agreed not to pursue;
>
> 1B. Ineffective assistance of appellate counsel for not properly preserving Claim 1A for federal habeas review;
>
> 2A. Ineffective assistance of trial counsel for not filing a petition for writ of quo warranto, as opposed to a motion to dismiss, upon discovering the prosecuting attorney was suspended from the Florida Bar when the amended charging information was filed and up until the sentencing hearing;
>
> 2B.  Ineffective assistance of appellate counsel for not challenging the denial of the "Motion to Dismiss Based Upon Prosecutorial Misconduct and Fraud on the Court";
>
> 3A. Ineffective assistance of trial counsel for not objecting to the prosecution's presentation of an altered and incomplete surveillance video;
>
> 3B. Ineffective assistance of trial counsel for counsel's failure to investigate and discover a *Brady*[1] or *Giglio*[2] violation.

[ECF No. 1].

---

[1] *Brady v. Maryland*, 373 U.S. 83 (1963).

[2] *Giglio v. United States*, 405 U.S. 150 (1972).

## III. Factual and Procedural Background

A. <u>The Charging Instrument and the Trial</u>

By amended information, the prosecution charged Petitioner with (1) improper use of prohibited lights in violation of Fla. Stat. § 316.2397; (2) falsely personating a police officer during the commission of a felony in violation of Fla. Stat. § 843.08; (3) armed burglary in violation of Fla. Stat. § 810.02(1)(b)2; and (4) grand theft of a firearm in violation of Fla. Stat. § 812.014(2)(C)5. [ECF No. 14-2 at 7-12].

Petitioner testified that he drove to Miami on October 13, 2011 to install a stereo system at an autoshop. [ECF No. 15-16 at 2, 4]. The following day, Petitioner went to the autoshop with Ms. Yessinia Lopez, Petitioner's ex-girlfriend. [*Id.* at 5]. According to Mr. Luis Rodriguez, an owner of Gamex Corporation and distributor of auto accessories, Petitioner purchased blue and red lights and expressed that he intended on using the lights to play pranks on his friends. [ECF Nos. 15-11 at 135-40, 15-16 at 14-15].

On October 17, 2011, Petitioner, Ms. Lopez, and her sister drove around Miami-Dade County pulling over their friends with the blue and red lights. [ECF No. 15-13 at 64-70]. At trial, *Williams*-rule evidence was presented before the jury as it pertained to Petitioner pulling over individuals with the police lights and

3

allegedly portraying himself to be a police officer. According to Mr. Michael Febre, he was walking his dog with a friend when Petitioner's vehicle pulled up. [ECF No. 15-14 at 65-66, 87]. Petitioner told Mr. Febre that his dog was illegal, exited his vehicle, and began examining the dog. [*Id.*]. Petitioner stated he was a law enforcement officer and threatened to place Mr. Febre in jail if he did not surrender the dog to him. [*Id.* at 66-67]. Petitioner ordered Mr. Febre to come back with the dog on a leash. [*Id.* at 66]. Mr. Febre went inside and told his girlfriend, Ms. Liat Fuentes, that a police officer stopped him and wanted to take their dog. [*Id.* at 85-86]. Ms. Fuentes stepped outside and asked Petitioner for his badge number, as she assumed Petitioner was actually a law enforcement officer because of his vehicle's "cop lights[.]" [*Id.* at 87]. Petitioner refused to provide his badge number. [*Id.* at 89]. In response, Ms. Fuentes began calling Sergeant Dorsette, an officer at the compliance center, to report Petitioner's conduct. [*Id.* at 89-90]. Ms. Fuentes testified that she had previously interacted with Sergeant Dorsette, who is a female officer. [*Id.*]. Upon hearing this, Petitioner stated that Sergeant Dorsette can come to the scene because Petitioner knows "him."  [*Id.*]. When Ms. Fuentes replied that Sergeant Dorsette is a female, Petitioner took off. [*Id.* at 90].

Afterwards, Petitioner pulled over one more person, which led to the charges in this case. Mr. Ricardo Moreno left his home, speeding through his neighborhood, after having an argument with his parents. [ECF No. 15-10 at 9-10]. As Mr. Moreno

4

pulled into a gas station, a black corvette with "police lights" followed and pulled in behind him. [*Id.* at 9]. Mr. Moreno testified that he stepped out of his vehicle but was ordered to remain inside the car by the Corvette's driver. [*Id.* at 11]. He identified Petitioner as the driver. [*Id.* at 13-14]. Petitioner walked around the gas pump while the red and blue lights continued blinking in his car. [ECF No. 12]; [ECF No. 15-10 at 11-12]. Mr. Moreno testified that Petitioner identified himself as a police officer. [*Id.* at 44]. Petitioner reportedly asked Mr. Moreno why he was speeding, requested Mr. Moreno's license, and inquired whether there were any guns or drugs in the car. [ECF No. 15-10 at 12-13]. Mr. Moreno said there were no drugs in the vehicle, but there was a firearm in the glove compartment. [*Id.* at 12-13]. Petitioner asked whether Mr. Moreno would take him back to his parents' house to confirm that they had an argument. [*Id.* at 13]. Mr. Moreno "to avoid the ticket" agreed. [*Id.*]. A video of what transpired at the gas station was played before the jury. [ECF Nos. 12, 15-10 at 83-84].

Mr. Moreno left the gas station and drove toward his house with Petitioner following. [ECF No. 15-10 at 14]. According to Mr. Moreno, Petitioner again turned on the lights, pulled up next to Petitioner, and told him to pull over. [*Id.* at 14, 21]. Petitioner ordered Mr. Moreno out of the vehicle and told him to place his hands on the trunk of the vehicle. [*Id.* at 21]. Petitioner patted down Mr. Moreno and ordered him to sit on the sidewalk. [*Id.* at 21].

While Mr. Moreno sat on the sidewalk, Petitioner asked for the location of the firearm. [*Id.* at 22]. Petitioner asked Mr. Moreno if he could retrieve the firearm, and Mr. Moreno acquiesced. [*Id.*]. Petitioner held the firearm, sat in his vehicle, and then told Mr. Moreno he was going to call his lieutenant. [*Id.* at 22-23]. Petitioner exited his vehicle and informed Mr. Moreno that the pistol was "clean." [*Id.* at 23]. Petitioner gave Mr. Moreno two choices: (1) forfeit the firearm so that it could be destroyed or (2) go to jail. [*Id.* at 23-24]. Petitioner then told Mr. Moreno that his possession of the firearm violated the law for lack of a concealed weapons license. [*Id.* at 24-25]. After some discussion about the legality of the firearm, Petitioner stated his name was Sergeant Anthony Rodriguez and gave a badge number. [*Id.* at 45]. Mr. Moreno agreed to forfeit the firearm and then asked if he was free to leave. [*Id.* at 25]. Once Mr. Moreno started driving, Petitioner continued following. [*Id.*].

Mr. Moreno called his friend Mr. Jorge Benitez, who was the owner of the firearm, and told him what happened. [*Id.* at 26]. Mr. Benitez advised Mr. Moreno to call the police and report Petitioner's conduct for failure to give paperwork so that he could later retrieve the seized firearm. [*Id.* at 31]. Mr. Moreno first called a non-emergency phone number for the police while parked at a nearby Walgreens. [*Id.* at 33-34]. While Mr. Moreno was on the phone, as he testified, Petitioner pulled up and asked him why he was calling in the firearm after he already told him not to do so. [*Id.* at 34]. Mr. Moreno, who described Petitioner as "intimidating," hung up the

6

phone call. [*Id.* at 35]. Petitioner allegedly threatened to arrest Mr. Moreno for loitering if he saw him in the area again. [*Id.*]. Mr. Moreno drove away with Petitioner following behind. [*Id.*].

Mr. Moreno called Mr. Benitez and explained what happened at the Walgreens parking lot. [*Id.* at 38]. Mr. Benitez told him, "You weren't stopped by a police officer. You were robbed. You need to call the police." [*Id.*]. Although Mr. Moreno felt Petitioner was actually a law enforcement officer [*Id.* at 39-40], Mr. Moreno called 911. [*Id.* at 39].

Law enforcement arrived. [*Id.* at 40]. While Mr. Moreno was speaking with an officer, Petitioner's vehicle drove by. [*Id.*]. Mr. Moreno pointed and said, "[T]hat's the car. That's the guy." [*Id.* at 40-41]. The vehicle quickly took off. [*Id.* at 41]. After speaking with officers [*Id.* at 41-42], Mr. Moreno went home to confirm whether a "police officer" came or dropped off the firearm, as Petitioner had seen his address. [*Id.* at 43, 69]. Mr. Moreno's mother testified that the two of them discussed that "something" had been taken from the car that night. [ECF No. 15-4 at 44].

Mr. Moreno met with a police sketch artist. [*Id.* at 48-49]. The sketch image appeared on the news requesting viewers to call in to the crime stoppers tip line. [ECF No. 15-12 at 37-38]. Among the various callers, three provided specific information and a name for the culprit—John Ramos. [*Id.* at 39, 43-44]. With that

name, Detective Feria was able to obtain photographs of Petitioner. [*Id.* at 39, 44]. Using that photograph, Detective Feria administered a photo lineup for Mr. Moreno during which Mr. Moreno immediately identified Petitioner as the individual who pulled him over. [ECF No. 15-12, 46-48]; [ECF No. 15-10 at 48-49].

At trial, Petitioner testified that he knew Mr. Moreno prior to the incident in question. According to Petitioner, he went to meet his acquaintance "Little Chris" who was with Mr. Moreno at a McDonalds. [ECF No. 15-16 at 6-7]. When Little Chris and Mr. Moreno pulled up, Petitioner entered Mr. Moreno's Acura and conversed with him about a firearm that Mr. Moreno had displayed. [*Id.* at 8-10]. Petitioner told Mr. Moreno he had no interest in the firearm but his friend "Jovani" might be interested in purchasing it. [*Id.* at 10]. Petitioner avers he served as a conduit between Mr. Moreno and Jovani. [*Id.* at 10-11]. A few days later, according to Petitioner, he encountered Petitioner at the gas station. [*Id.* at 35-38]. Petitioner admitted to pulling up behind Mr. Moreno with the police lights on and testified that that Mr. Moreno discussed the argument he had with his parents. [*Id.* at 37-38]. In Petitioner's version of events, Mr. Moreno knew he was not a police officer because Mr. Moreno knew his brother and that he knew all of Mr. Moreno's closest friends. [*Id.* at 40-41]. Petitioner also testified that he has seen him around his neighborhood. [*Id.* at 41]. Petitioner's mother testified that Mr. Moreno used to visit the house next door. [ECF No. 15-15 at 92-93].

With respect to the video depicting the stop at the gas station, Petitioner testified that it was not an accurate video because he knows he was laughing and smiling as he approached Mr. Moreno's vehicle. [ECF Nos. 15-16 at 36-38, 15-17 at 45-46]. Petitioner testified that he knows the original video was also better quality because the version that appeared on local news coverage showed the "shine" of Petitioner's head and the grin on his face. [*Id.* at 46]. Petitioner added that he told his attorney about the discrepancies with the surveillance footage during the criminal proceedings. [*Id.* at 47]. However, Petitioner said he did not tell his attorney about this prior to the trial. [*Id.* at 48]. At the same time, Petitioner averred that this was not a new allegation surfacing at trial. [*Id.*]. Later, on redirect, Petitioner explained that the first time he saw the version that was used at trial was when it was played before the jury. [*Id.* at 88-89].

As to the second stop, Petitioner testified that he did not pull over Mr. Moreno or have him sit on the sidewalk, as the entire incident was false. [ECF No. 15-16 at 40]. With respect to the third stop in the Walgreens parking lot, Petitioner stated that the two planned to meet there. [*Id.* at 40]. While in the parking lot, Petitioner informed Mr. Moreno that Jovani would not be purchasing the firearm and that instead Mr. Moreno will have to file a report for a missing firearm. [*Id.* at 45-46]. Petitioner allegedly advised Mr. Moreno to call the non-emergency police phone number. [*Id.* at 46]. The operator instructed Mr. Moreno to call an emergency line.

[*Id.*]. Upon hearing this, Petitioner prepared to leave and asked for his name to be left out of the report. [*Id.*]. Mr. Moreno told Petitioner that he had to pay for the firearm to which Petitioner replied that it was not his problem. [*Id.*]. The two began to argue about whether Petitioner would pay and his ability to pay for the firearm until Petitioner left. [*Id.* at 48-50].

According to Mr. Moreno, he discovered that Petitioner's brother was "Touchi," an individual he had played poker with at a friend's house, during the proceedings against Petitioner. [ECF No. 15-10 at 63-64]. Mr. Moreno, however, stated he never socialized with Touchi outside of playing poker, never met Touchi's family members, and never met Petitioner before the night he was stopped with the police lights. [*Id.*]. Mr. Moreno stated that he did not view Touchi as a friend or know his real name. [*Id.*]. Mr. Moreno testified that the only time Petitioner had been inside Mr. Moreno's car was when Petitioner searched for the firearm. [*Id.* at 64].

Although Petitioner insisted that Ms. Lopez was in the vehicle at the gas station and the Walgreens throughout his testimony, Ms. Lopez was clear—she was not in the vehicle during the gas station stop involving Mr. Moreno and she had not seen Petitioner dressed the way he appeared in the video. [ECF No. 15-14 at 6-7]. Ms. Lopez similarly did not provide any testimony confirming she was at the Walgreens parking lot. Ms. Lopez clarified that Petitioner had "a good time" pulling over friends, family, and strangers with his police lights. [ECF No. 15-14 at 34-35].

10

B. <u>The Verdict, and Motion for Arrest of Judgement or Judgment of Acquittal</u>

The jury found Petitioner guilty of (1) improper use of prohibited red and blue lights and (2) falsely personating a police officer during the commission of a felony. [ECF No. 14-3 at 26]. In addition, Petitioner was acquitted of (3) burglary and (4) grand theft of a firearm. [*Id.*].

Following his trial, Petitioner's trial counsel filed a motion for arrest of judgment or in the alternative judgement of acquittal. [ECF No. 14-5]. The motion argued that Petitioner's acquittal on armed burglary and grand theft rendered the conviction of falsely personating a police officer during the commission of a felony "truly inconsistent" under Florida law. [*Id.*].

The prosecution responded by conceding these were legally inconsistent verdicts but submitted that the trial court should instead "enter a conviction for the lesser degree or necessary lesser included offense of Falsely Personating a Police Officer[.]" [ECF No. 14-16 at 1]. The prosecution argued that the "during the felony" finding is similar to a weapons enhancement finding that should be made by a jury, requiring that this finding be stricken. [*Id.* at 2]. In the alternative, the prosecution argued that the conviction be vacated so that the necessary lesser included offense be entered. [*Id.*].

A hearing was held on the motion. [ECF No. 15-20]. At the hearing, the trial court explained that the verdict was not "truly inconsistent" because the amended

11

information cited the statute for false personation of a police officer, meaning the lesser included offense was referenced. [*Id.* at 9-11]. Trial counsel argued that, notwithstanding a jury's power to impose a lesser included offense, the trial court lacked the authority to impose a lesser included offense that was not submitted to the jury. [*Id.* at 12]. In support, he argued that the prosecution should have requested instructions to the lesser included offense if that had been the prosecution's intention. [*Id.* at 11]. Trial counsel also added that all parties previously agreed to "go all or nothing" at the charging conference without lesser included offenses. [*Id.*].

Ultimately, the trial court vacated the conviction and adjudication to the charge of falsely personating an officer during the commission of a felony and instead found Petitioner guilty of the necessarily lesser included offense—falsely personating an officer. [ECF No. 14-7]. Petitioner was sentenced to ten years' imprisonment as to the charge concerning the impersonation of a police officer and 364 days as to improperly displaying red and blue lights on his car. See generally [ECF No. 14-4].

C. Direct Appeal

On appeal, Petitioner raised the following arguments:

I. The Trial Judge Erred in Entering a Judgment and Sentence for the Lesser Included Offense of Impersonating a Police Officer after Vacating Defendant's Conviction for Impersonating a Police Officer During the Commission of a Felony because the Jury was not

12

Instructed on this Lesser Offense based upon an Agreement between the State and the Defense;

II. The Prosecutor Destroyed the Jury's Ability to Fairly Resolve the Credibility Issues in this Case by (1) Improperly Bolstering the Credibility of the Victim with Improper Opinion Testimony and (2) Improperly Attacking the Credibility of Defendant by Eliciting Specific Acts of Misconduct that did not Result in a Criminal Conviction.

[ECF No. 14-8].

In *Ramos v. State*, 152 So. 3d 69 (Fla. 3d DCA 2014), the Third District Court of Appeal affirmed the convictions and sentences without a written opinion and citing only to *Goddard v. State*, 458 So. 2d 230 (Fla. 1984) and *State v. Di Guilio*, 491 So. 2d 1129 (Fla. 1986). Petitioner filed a motion for rehearing, request to certify question of great public importance, or motion for a written opinion. [ECF No. 14-10]. The motion was denied. [ECF No. 14-11].

Petitioner filed a notice to invoke the discretionary jurisdiction of the Florida Supreme Court. [ECF No. 14-12]. The Florida Supreme Court held it was without jurisdiction and dismissed the petition on January 8, 2015. [ECF No. 14-14].

D. Postconviction Proceedings

On March 12, 2015, Petitioner filed a Rule 3.800(a) motion seeking to remove his designation as a habitual felony offender. [ECF No. 14-15 at 3-12]. The trial court denied relief. [*Id.* at 1-2].

On January 5, 2016, Petitioner filed his Rule 3.850 Motion. [ECF No. 14-16 at 1-25]. Petitioner argued:

> I. The Prosecutor's Presentation of Tampered Video to the Jury without Notice to Defendant and his Counsel Constituted Prosecutorial Misconduct;
>
> II.  The Prosecutor's Presentation of Tampered Video to the Jury without Notice to Defendant's Counsel rendered Counsel ineffective;
>
> III. Trial Counsel was Ineffective for Failing to Investigate the Tampered Video and Move to Exclude the video;
>
> IV. Appellate Counsel was Ineffective for Failing to Argue that the Trial Judge Erred by Submitting Instructions that the Parties Initially Agreed to not Submit to the jury.

[ECF No. 14-16 at 1-25]. After the State Responded [*Id.* at 26-32], Petitioner amended his Petition with the following grounds, *verbatim*:

> I. Defendant was Deprived of his Right of Effective Assistance of Counsel When His Attorney Failed to Properly Investigate and File a Writ of Quo Warranto where Trial Counsel filed the Improper Vehicle, a Motion to Dismiss, to Seek Relief for the Defendant;
>
> II. Defendant was Deprived of his Right of Effective Assistance of Counsel When his Attorney Failed to Object to the State not Presenting the Entire Surveillance Video under the Rule of Completeness, to the Jury.

[ECF No. 14-17] (alterations to capitalization).

As to issue one, Petitioner specifically argued that trial counsel was ineffective for failing to challenge the prosecutor's temporary suspension from the Florida Bar due to his failure to post CLE credits by way of a writ of quo warranto.

14

[*Id.* at 3-5]. To prove prejudice, Petitioner argued that the parties were running under a speedy trial window and this particular argument would have extended the time to prepare for trial. [*Id.* at 5].

The trial court denied relief on the merits. [ECF No. 14-20]. Although Petitioner appealed [ECF No. 14-21], the Third District Court of Appeal affirmed without a written decision. *Ramos v. State*, 237 So. 3d 328 (Fla. 3d DCA 2017). The mandate issued on November 28, 2017. [ECF No. 14-25].

During those proceedings, Petitioner filed a petition alleging ineffective assistance of appellate counsel for not arguing that the trial court erroneously denied Petitioner's motion to dismiss. [ECF No. 14-26]. The petition was denied. [ECF No. 14-28]. A motion for reconsideration was filed but ultimately denied. [ECF Nos. 14-29, 14-30]. The instant Petition was then filed. [ECF No. 1].

## IV. Timeliness

Stated broadly, an application for a writ of habeas corpus under 28 U.S.C. § 2254 must be filed before a 1-year time limitations period expires, and this limitation period usually runs from the date the challenged judgment became "final." 28 U.S.C. § 2244(d). In this case, Respondent does not dispute timeliness of the Petition. [ECF No. 13 at 23]. As such, the Petition is timely.

## V. Exhaustion

Pursuant to 28 U.S.C. 2254(b)-(c), petitioners must exhaust their claims before presenting them in a federal habeas petition. When petitioners do not properly present their claims to a state court by exhausting those claims and complying with the applicable state procedure, § 2254 may bar federal review of those claims in federal court. *Mason v. Allen*, 605 F.3d 1114, 1119 (11th Cir. 2010) (relying upon 28 U.S.C. § 2254(b)-(c)).

In accordance with § 2254(b)(3), Respondent expressly waived its exhaustion defense. [ECF No. 13 at 23-24]. With respect to Claim 3B, however, Respondent inconsistently asserted that it was not exhausted. [*Id.* at 49]. Ultimately, the Court need not resolve whether Petitioner properly exhausted Claim 3B, as the claim may be denied on the merits despite any failure to exhaust. *See* 28 U.S.C. § 2254(b)(2) (providing that habeas petitions "may be denied on the merits, notwithstanding the failure of the applicant to exhaust" state court remedies).

## VI. Standard of Review

Several limits exist on the power of a federal court to grant an application for a writ of habeas corpus on behalf of a state prisoner. *See Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

The most restrictive limit is that found in § 2254(d). As amended by the AEDPA, pursuant to § 2254(d), a federal court may grant habeas relief from a state court judgment only if the state court's decision on the merits of the issue was (1)

contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d).

"A state court's decision is 'contrary to' federal law if the 'state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts.'" *Consalvo v. Sec'y for Dep't of Corr.*, 664 F.3d 842, 844 (11th Cir. 2011) (quoting *Williams v. Taylor*, 529 U.S. 362, 413 (2000)) (internal brackets omitted). A state court's decision involves an unreasonable application of federal law "if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Consalvo*, 664 F.3d at 844 (quoting *Williams*, 529 U.S. at 413). Importantly, AEDPA's deferential standard under § 2254(d) applies only whenever state court proceedings adjudicated a claim on the merits. *See Cullen*, 563 U.S. at 181.

To qualify as an adjudication on the merits, very little is required. In fact, federal courts should presume that § 2254(d)'s deference applies. *See, e.g.*, *Harrington v. Richter*, 562 U.S. 86, 99 (2011) ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed

17

that the state adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.").

Even where there was a summary denial and no reasons for the denial of relief were articulated by the state trial court, such a ruling is also presumed to be an adjudication on the merits. *Id.* at 100; *see also Gill v. Mecusker*, 633 F. 3d 1272, 1288-89 (11th Cir. 2011) (acknowledging the well-settled principle that summary affirmances are presumed adjudicated on the merits and warrant deference).

"The presumption [in favor of a merits ruling existing] may be overcome" only "when there is reason to think some other explanation for the state court's decision is more likely." *Richter*, 562 U.S. at 99-100 (relying upon *Ylst v. Nunnemarker*, 501 U.S. 797, 803 (1991).

Recently, in *Wilson v. Sellers*, 138 S. Ct. 1188, 1192-94 (2018), the Supreme Court held there is a "look through" presumption in federal habeas corpus law, as silence implies consent. This means federal courts should rely upon the "last related state-court decision" that provides a relevant rationale when the highest state court's adjudication on the merits of a claim is unaccompanied by an explanation. *See id.* at 1192. Put into practice, *Wilson* clarifies the reasoning that is presumptively afforded § 2254(d)'s deference.

Federal courts may also deny § 2254 petitions if the claims would fail under *de novo* review, a more favorable standard, as a habeas petitioner would surely not

be entitled to a writ under § 2254(d) if their claim would fail under that standard. *See, e.g.*, *Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010); *see also Hittson v. GDCP Warden*, 759 F.3d 1210, 1248 (11th Cir. 2014). In doing so, federal courts may decline to resolve whether § 2254(d) applies. *See Trepal v. Sec'y, Fla. Dep't of Corr.*, 684 F.3d 1088, 1109-10 (11th Cir. 2012).

## VII. Discussion

A. Generally Applicable Substantive Law

The Sixth Amendment affords a criminal defendant the right to "the Assistance of Counsel for his defen[s]e." U.S. Const. amend. VI. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984).

To prevail on a claim of ineffective assistance of counsel, a habeas litigant must demonstrate both (1) that his counsel's performance was deficient, and (2) a reasonable probability that the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687. An ineffective assistance of counsel claim may be raised with respect to errors made by trial counsel or direct appeal counsel, and both are governed by *Strickland*. *See, e.g.*, *Raleigh v. Sec'y, Fla. Dep't of Corr.*, 827 F.3d 938, 957 (11th Cir. 2016).

The deficiency prong is met if no competent counsel would have taken the action that trial counsel took during the proceedings. *Gordon v. United States*, 518 F.3d 1291, 1301 (11th Cir. 2008) (citations omitted); *Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000). Regarding the prejudice prong, it is met if, but for counsel's deficient performance, the outcome of the proceeding would have been favorable. *Strickland*, 466 U.S. at 694. And yet, the error must also be "so serious" that the error "deprive[d] the defendant of a fair trial, a trial whose result is reliable[,]" in order to satisfy the prejudice prong. *Strickland*, 466 U.S. at 687.

## B. Claim 1A—Entering a Conviction and Sentence for a Lesser Included Offense

In Claim 1A, Petitioner submits that the trial court entering a conviction and sentence for a lesser included offense that was not submitted to the jury over the previously vacated inconsistent verdict violated due process. [ECF No. 1 at 6-7].

This claim was raised on direct appeal and denied in *Ramos v. State*, 152 So. 3d 69 (Fla. 3d DCA 2014). In that decision, the Third District Court of appeal cited to *Goddard v. State*, 458 So. 2d 230 (Fla. 1984) and *State v. Di Guilio*, 491 So. 2d 1129 (Fla. 1986). The claim was, therefore, presumptively adjudicated on the merits and is subject to § 2254(d). *See Richter*, 562 U.S. at 99-100. Further, based on the citation to state law, this Court must presume the Third District Court of Appeal's denial was rooted in state law. *See Wilson*, 138 S. Ct. at 1195-97.

20

Even assuming the federal nature of this claim had been preserved, however, the Petition and Reply do not cite a Supreme Court case. [ECF Nos. 1 at 6-8; 16 at 1-4]. As Petitioner has not cited a Supreme Court decision that supports his position, and the Undersigned is unaware of any such decision, Petitioner cannot show the state court's resolution of the claim was contrary to or an unreasonable application of clearly established federal law. *See Putman v. Head*, 268 F.3d 1223, 1241 (11th Cir. 2001) (defining "clearly established federal law" as the holdings of Supreme Court decisions). Thus, Petitioner has not met his burden under § 2254(d).

At any rate, federal courts may modify judgments to impose lesser included offense "without detrimentally affecting [a] defendant's rights" provided that the facts would have supported the lesser-included offense. *United States v. Castro-Trevino*, 464 F.3d 536, 543 (5th Cir. 2006); *see also Rutledge v. United States*, 517 U.S. 292, 306 (1996). Additionally, federal appellate courts may direct the entry of judgments on lesser included offenses even though the jury was not given instructions on that lesser included offense. *See United States v. Hunt*, 129 F.3d 739, 745-46 (5th Cir. 1997). Given that precedent, it is unlikely Petitioner would have been able to show a constitutional error transpired even under *de novo* review. Therefore, the claim must be denied.

C. <u>Claim 1B—Ineffective Assistance for not Preserving Claim for Federal Habeas Review</u>

In Claim 1B, Petitioner submits his appellate counsel was ineffective for failing to raise or properly preserve Claim 1a for federal habeas review. To the extent Petitioner submits that *Martinez v. Ryan*, 566 U.S. 1 (2012), excuses some procedural default of Claim 1A, the equitable doctrine recognized in *Martinez v. Ryan* does not apply to claims of ineffective assistance of appellate counsel. *See Davila v. Davis*, 137 S. Ct. 2058, 2070 (2017).

Additionally, to the extent Petitioner has presented a standalone claim of ineffective assistance of appellate counsel, Petitioner has not proven federal law prohibited the trial court from imposing a lesser included offense where there was evidence to support the lesser included offense, as already mentioned. Therefore, even under *de novo* review, Petitioner cannot show a reasonable probability of success had the claim been raised on appeal. *See Joiner v. United States*, 103 F.3d 961, 963 (11th Cir. 1997). Thus, this claim must be denied.

D. Claim 2A—Ineffective Assistance for not Filing a Petition for Writ of Quo Warranto

In Claim 2A Petitioner contends trial counsel was ineffective for not filing a writ of quo warranto, as opposed to a motion to dismiss, regarding the prosecuting attorney's bar status during the trial proceedings. [ECF No. 1 at 9-12]. As respondent points out, this claim relates to a motion to dismiss filed by Petitioner's counsel on

January 11, 2013 while Petitioner was awaiting sentencing. [ECF No. 13 at 39] (citing to [ECF No. 14-26 at 63-75]).

In the motion, it detailed that the prosecuting attorney's bar license was suspended because of the attorney's failure to properly report continuing legal education course requirements. [ECF No. 14-26 at 63, 74-75]. The motion asserted that the prosecuting attorney concealed his suspension from the bar and that this concealment removed the ethical and constitutional obligations that prosecutors are ordinarily bound to obey rendering the trial unfair. [*Id.* at 68-70].

The State's response asserted that the prosecuting attorney's suspension was the result of an inadvertent clerical error and that the prosecuting attorney was in fact licensed to practice law. [ECF No. 14-27 at 3-4]. More specifically, the State explained that the prosecuting attorney merely failed to report all of his completed hours to the Florida Bar. [*Id.*]. The prosecuting attorney's bar status changed from active to delinquent on August 21, 2012, and a petition for removal of CLER delinquency was filed on August 30, 2012. [*Id.* at 4]. After a newspaper article was published on November 26, 2012, the prosecuting attorney purportedly became aware that his status was still suspended. [*Id.*]. That day, the prosecuting attorney contacted the Florida Bar, and his active status was reinstated the following morning. [*Id.*].

In denying the instant claim, the state trial court held that it is immaterial whether trial counsel filed this argument by way of a writ of quo warranto or in a motion to dismiss. [ECF No. 14-20 at 1-2]. Instead, Petitioner was unable to show any harm resulted because the prosecuting attorney demonstrated he believed the error had been fixed and because another state attorney could have carried out the prosecution in his place. [*Id.*]. As such, Petitioner would not be able to show any prejudice. [*Id.*]

As this claim was affirmed on appeal, the claim was presumptively adjudicated on the merits subjecting this claim to § 2254(d)'s additional limitation. *See Richter*, 562 U.S. at 99-100. Pursuant to *Wilson v. Sellers*, the state trial court's reasoning is the presumptive reasoning of the silent opinion issued by the Third District Court of Appeal. *See Wilson*, 138 S. Ct. at 1195-97

Again, Petitioner's claim is focused on whether or not his attorney pursued the right procedural vehicle in raising this claim. As the state trial court concluded that this distinction was irrelevant because a different state attorney could have signed the charging instrument and handled the case, this conclusion on the prejudice prong would not have been contrary to or an unreasonable application of clearly established federal law. Because Petitioner cannot meet his burden under § 2254(d) as it relates to the prejudice prong, the Court need not address the deficiency prong. *See Dingle v. Sec'y for Dep't of Corr.*, 480 F.3d 1092, 1100 (11th Cir. 2007).

E. Claim 2B—Ineffective Assistance of Appellate Counsel for not Appealing the
Denial of the Motion to Dismiss Based Upon the Alleged Prosecutorial
Misconduct

In Claim 2B, Petitioner argues his appellate counsel was ineffective for not appealing the denial of the motion to dismiss relating to the prosecuting attorney's bar suspension. [ECF No. 1 at 9-11]. Respondent argues that Petitioner cannot show prejudice on appeal because the underlying issue before the trial court lacked merit. [ECF No. 13 at 46].

The Court need not settle whether § 2254(d) applies. As the state trial court concluded, Petitioner cannot show prejudice because another attorney could have stepped in to replace the prosecuting attorney. Consequently, Petitioner cannot show a reasonable probability of a different outcome on appeal even under *de novo* review. *See Joiner*, 103 F.3d at 963. This claim should, therefore, be denied. The Court need not address the deficiency prong. *See Dingle*, 480 F.3d at 1100.

E. Claim 3A—Ineffective Assistance for not Objecting on the Basis of the Rule of
Completeness

In Claim 3A, Petitioner contends that his trial counsel was ineffective for failing to object to the presentation of the surveillance video, based on the rule of completeness, because the surveillance video presented to the jury was either altered or incomplete. [ECF No. 1 at 13-15]. Petitioner alleges that the surveillance video

25

used by the prosecution prejudiced him by giving a false impression that he was attempting to impersonate a police officer when he pulled into the gas station behind Mr. Moreno. [*Id.*]. According to Petitioner, the video played before the jury had 53 seconds of missing footage by skipping and reversing over important events. [*Id.* at 14]. Petitioner submits his counsel should have been alerted to this issue because trial counsel knew that the CD used to play the video before the jury was a different format than the original version of the surveillance video, which was a USB flash drive. [*Id.*].

The Court need not inquire whether § 2254(d) applies, as this claim can easily be denied even under *de novo* review. Here, even assuming the video had been excluded or a video with Petitioner's version of what should appear on the video presented, Petitioner cannot show prejudice.

Petitioner conceded that he used the police lights when he saw Mr. Moreno and pulled in behind him. Given the *Williams*-rule testimony presented and Petitioner's intent to prank his friends, a reasonable jury would have inferred that Petitioner knew the police lights would cause individuals, like Mr. Moreno, to believe he was a police officer by activating the blue and red lights. As previously mentioned, Petitioner testified that he was laughing and smiling on the version of the surveillance footage played on local news coverage. The mere fact that Petitioner insists that an accurate video would show him laughing or grinning overlooks that

police officers can laugh and do grin. More importantly, it would not undermine the jury's determination that Petitioner portrayed himself to be a police officer.

Further, Petitioner's testimony regarding how he knew of Mr. Moreno undermined his credibility. To be specific, Petitioner alleged that he knew of Mr. Moreno because his brother is an acquaintance of his. Even if that were true, the jury likely found it incredible that Mr. Moreno would have divulged personal information to someone with virtually no personal connection to him. The only logical and credible conclusion that reasonable jurors likely drew is that Mr. Moreno conveyed this information after Petitioner inquired why he was speeding. Taken together, there is no reasonable probability of a different outcome even if Petitioner's trial counsel had objected to the presentation of the video. *See Strickland*, 466 U.S. at 687. As such, the Court need not inquire into the deficiency prong. *See Dingle*, 480 F.3d at 1100. This claim must be denied.

F. Claim 3B—Ineffective assistance of trial counsel for counsel's failure to investigate and discovery a *Brady*/*Giglio* violation

In Claim 3B, Petitioner contends his trial counsel was ineffective for not investigating and recognizing a *Brady* and *Giglio* violation. [ECF No. 1 at 18]. Petitioner concedes that he never raised this claim in the state courts but argues that *Martinez v. Ryan* allows him to overcome the procedural default of this claim.

The underlying claim, however, lacks merit. To support his argument, Petitioner submits that the prosecuting attorney committed a *Brady*/*Giglio* violation by converting the materials that were on a flash drive onto a CD-R thereby replacing it with an altered or incomplete video. [ECF No. 1 at 18]. As already mentioned, regardless of whether the version of events described by Petitioner appeared on the video or if the video had never been presented, it would not have changed the outcome. Thus, Petitioner cannot satisfy the materiality requirement to prove a *Brady* or *Giglio* transpired. *See, e.g.*, *Trepal v. Sec'y, Fla. Dep't of Corr.*, 684 F.3d 1088, 1108 (11th Cir. 2012) (explaining *Brady* violations inquire whether there is a "reasonable probability the result would have been different" and that *Giglio* violations inquire whether "there is any reasonable likelihood that the false testimony could have affected the jury's judgment."). In turn, as Petitioner cannot prove materiality, he cannot prove prejudice under *Strickland*. *See Strickland*, 466 U.S. at 687. Accordingly, notwithstanding any procedural bars that might apply, this claim lacks merit and should be denied. Lastly, the Court need not resolve whether trial counsel was deficient. *See Dingle*, 480 F.3d at 1100.

### IX. Evidentiary Hearing

In this case, the state record provides all pertinent facts, demonstrating an evidentiary hearing in federal court is not needed. *See Schiro v. Landrigan*, 550 U.S. 465, 474 (2007) ("It follows that if the record refutes the applicant's factual

allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing."). *See also* 28 U.S.C. § 2254(e)(2) (stating federal courts "shall *not* hold an evidentiary hearing" "unless the application shows" circumstances that are inapplicable to the instant Petition) (emphasis added).

## X. Certificate of Appealability

A prisoner seeking to appeal a district court's final order denying his petition for writ of habeas corpus has no absolute entitlement to appeal but must obtain a certificate of appealability ("COA"). *See* 28 U.S.C. § 2253(c)(1); *Harbison v. Bell,* 556 U.S. 180 (2009). This Court should issue a certificate of appealability only if the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

Where a district court has rejected a petitioner's constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. *See Slack v. McDaniel,* 529 U.S. 473, 484 (2000). However, when the district court has rejected a claim on procedural grounds, the petitioner must show that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.*

After careful consideration of the record, this Court should not issue a certificate of appealability. If Petitioner disagrees, he may bring his argument to the attention of the District Judge in objections.

## XI. Recommendations and Conclusions

Based upon the foregoing it is recommended that:

1.    the Petition be DENIED [ECF No. 1];

2.    an evidentiary hearing be DENIED;

3.    a certificate of appealability NOT ISSUE; and

4.    the case CLOSED.

Objections to this report may be filed with the District Judge within fourteen (14) days of receipt of a copy of the report. Failure to file timely objections shall bar petitioner from a *de novo* determination by the District Judge of an issue covered in this report and shall bar the parties from attacking on appeal factual findings accepted or adopted by the district judge, except upon grounds of plain error or manifest injustice. *See* 28 U.S.C. § 636(b); *Thomas v. Arn*, 474 U.S. 140, 149 (1985).

DONE AND ORDERED at Miami, Florida, this 16th day of September, 2020.

_____

UNITED STATES MAGISTRATE JUDGE


cc:    John Louis Ramos
       555898
       Polk Correctional Institution

30

Inmate Mail/Parcels
10800 Evans Road
Polk City, FL 33868
PRO SE

Nikole Hiciano
Attorney General Office
Department of Legal Affairs
444 Brickell Avenue
Suite 650
Miami, FL 33131
305-377-5441
Email: Nikole.Hiciano@myfloridalegal.com

Noticing 2254 SAG Miami-Dade/Monroe
Email: CrimAppMIA@MyFloridaLegal.com